1  Samuel R. Maizel (CA Bar No. 189301)
   Pamela E. Singer (OR Bar No. OSB 89423)
2  PACHULSKI STANG ZIEHL & JONES LLP
   150 California Street, 15th Floor
3  San Francisco, California  94111-4500
   Telephone: 415/263-7000
4  Facsimile: 415/263-7010

5  Karen Cordry (DC Bar No. 278051)
   National Association of Attorneys General
6  2030 M Street, N.W., 8th Floor
   Washington, DC  20036
7  Telephone: 202/326-6025
   Facsimile: 202/331-1427

8  Attorneys for Alabama, Alaska, Arizona, Arkansas,
   California, Colorado, Georgia, Idaho, Indiana, Illinois,
9  Kansas, Kentucky, Louisiana, Maine, Maryland,
   Massachusetts, Michigan, Missouri, Montana, Nebraska,
10 Nevada, New Hampshire, New Jersey, New Mexico, New
   York, North Carolina, North Dakota, Ohio, Oklahoma,
11 Oregon, Pennsylvania, Rhode Island, South Carolina, South
   Dakota, Tennessee, Utah, Virginia, Washington, West
12 Virginia, and Wyoming, and the District Of Columbia

13                  UNITED STATES BANKRUPTCY COURT

14                       DISTRICT OF OREGON

15 In re:                              Case No.: 05-34156-elp11

16 Carolina Tobacco Company,           Chapter 11

17                     Debtor          **MOTION FOR AN ORDER TO SHOW
                                       CAUSE WHY THE DEBTOR AND
18                                     DAVID REDMOND SHOULD NOT BE
                                       FOUND IN CONTEMPT OF
19                                     "EXTENSION ORDER"**

20

21 **TO THE HONORABLE ELIZABETH L. PERRIS, UNITED STATES BANKRUPTCY**

22 **JUDGE:**

23        Movant States, the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado,

24 Georgia, Idaho, Indiana, Illinois, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts,

25 Michigan, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New

26 York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South

27 Carolina, South Dakota, Tennessee, Utah, Virginia, Washington, West Virginia, and Wyoming and

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  the District of Columbia, (collectively, "Movant States")[1] hereby file this *Motion for an Order to*

2  *Show Cause Why Debtor and David Redmond Should Not Be Found in Contempt of "Extension*

3  *Order"* (the "Contempt Motion" or "Motion").  This Contempt Motion arises from the same facts set

4  forth in the Adversary Complaint filed in Case No. 10-03126[2] (the "Adversary Proceeding") and

5  bolsters the allegations set forth therein.  Because of the similarity between the facts and issues in the

6  Adversary Proceeding and in this Contempt Motion, the Movant States respectfully suggest that any

7  briefing or hearing on this Contempt Motion be consolidated with any briefing or hearing in the

8  Adversary Proceeding for all future proceedings herein.

9      The Contempt Motion bolsters the legal bases for granting relief to the Movant States in the

10  Adversary Proceeding with respect to the Debtor's misuse of the funds placed into certain

11  Segregated Accounts established under its confirmed plan and its failure to satisfy its statutory

12  escrow obligations.  This Motion is also intended to allow the Movant States to assert the full scope

13  of remedial measures allowed in a contempt proceeding, as well as to obtain relief personally from

14  David Redmond, the President of the Debtor ("Redmond").

15      In the latter regard, the Contempt Motion provides direct support for entry of the proposed

16  protective restraining order ("PRO") that is submitted herewith.  In the Preliminary Injunction Order

17  ("PI Order") entered by this Court on May 5, 2010 in the Adversary Proceeding [Docket No. 12], the

18  Court directed that a PRO be entered against Redmond and set out certain minimum parameters for

19  the relief to be contained therein.  The Movant States were directed to file a detailed PRO with the

20  Court if its terms could not be agreed upon by the Parties.  The language set forth in the PRO has

21  been provided to the Debtor and Redmond.  They have not yet agreed thereto, and have suggested

22  _____

23  [1]    The Movant States herein are those of the Settling States (i.e., those States that entered into the tobacco Master Settlement Agreement (the "MSA") in 1998) in which the Debtor has sold its product, is currently selling its product, has deposited escrow, or has sought to be certified to sell its product.  When describing the general nature of the tobacco regulatory regime established under the MSA, the term "Settling States" will be used to refer to all of the signatories to the MSA.

25  [2]    An amended version of the Complaint is being filed at this time to add additional States as Plaintiffs so that all States as to which the Debtor has placed funds into escrow are named as Plaintiffs, since the granting of relief under the Complaint may affect the escrow balances held by all such States.  The State of South Dakota is included in the caption solely for that reason.  It has consistently taken the position that it does not view the Debtor as the proper party to be listed on its directory and has not allowed it to make sales in that State.  Nevertheless, a small amount of funds are held in an escrow account for South Dakota and those funds will be dealt with under the provisions of the Complaint.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   that the scope of the relief sought therein might not be fully warranted by the terms of the PI Order.

2   The Movant States disagree and assert that the PRO as drafted is fully authorized by the PI Order.

3          To avoid any doubt in that regard, the Movant States seek the relief set out in the proposed

4   PRO pursuant to this Contempt Motion.  The restrictions set forth in the PRO (and authorized

5   against Redmond)  are intended to ensure that his assets are retained while the Movant States

6   investigate the improper removal of funds from the various segregated accounts established in this

7   case and their use (including the extent to which they may have been transferred to Redmond

8   personally) and litigate before this Court their assertions regarding Redmond's personal liability to

9   reimburse those accounts based on his direction to the Debtor that the funds be removed.

10         Inasmuch as this Contempt Motion is so closely intertwined with the *Complaint and*

11  *Emergency Request for Temporary Restraining Order ("TRO")* that were filed on April 26, 2010 in

12  the Adversary Proceeding [Docket No. 1], the facts and arguments presented there will only be

13  summarized here.  This Motion relies on the same facts and evidence presented there, as well as

14  certain additional evidence received from April 26, 2010 on, which evidence is also included in an

15  Declaration by Karen Cordry ("Cordry Declaration"), which also includes allegations relating to the

16  contempt issues herein.[3]  The Memorandum of Points and Authorities ("Memorandum") filed

17  herewith is similarly intended to supplement the memorandum filed in the Adversary Proceeding in

18  support of the motion for a temporary restraining order (the "TRO Memorandum") and the facts and

19  arguments set forth therein are incorporated herein by reference as if set forth fully herein.

20         In addition to asking the Court to enter the PRO, the Movant States further request that the

21  Court issue an order to the Debtor and Redmond requiring them to show cause why a final

22  adjudication of contempt, with remedies including, but not limited to, an order as set forth below and

23  an award of attorneys' fees and costs against the Debtor and Redmond and in favor of the Movant

24  States.  Finally, the Movant States also request that the adjudication also include such other relief as

25  the Court may deem appropriate, including compensatory and coercive fines as required to remedy

26  the contumacious conduct of the Debtor and Redmond.

27  ───────────────

28  [3] The Cordry Declaration is nearly identical to the Declaration filed in the Adversary Proceeding in
    support of the motion for a temporary restraining order.  A redline will be submitted to the Court
    separately to allow the Court and the parties in interest to conveniently identify the differences.

This Contempt Motion is made pursuant to 11 U.S.C. §105, Rule 65 of the Federal Rules of Civil Procedure ("FRCP") and Rule 7065 of the Federal Rules of Bankruptcy Procedure ("FRBP") and the plenary power of this Court to ensure compliance with its judgments, on the ground that Debtor has repeatedly, willfully violated its obligations under the Court's March 29, 2010 order granting an extension of time for the Movant States to move to vacate the Settlement Order (the Extension Order).[4]  The Motion is based on the Memorandum and the Cordry Declaration, the findings of this Court in the PI Order, the arguments of counsel, and other admissible evidence properly brought before the Court at or before the hearing on this Motion.  In addition, the Movant States request that the Court take judicial notice of all documents filed with the Court in this case.

As found in the PI Order, the Debtor at the direction of Redmond has, since October 2009, systematically removed virtually every cent that it was obligated to place into the Segregated Accounts under the Confirmed Plan and into escrow pursuant to the Plan Settlement approved by this Court's order of October 8, 2009 ("the Plan Settlement").  In particular, they took those actions despite the entry of the Extension Order that explicitly provided for the Debtor's obligation to make deposits into the Segregated Accounts and to transfer funds from the Segregated Accounts to the Movant States' statutory escrow accounts.  This conduct as set forth in detail in the Adversary Complaint, the TRO Memorandum and the attached Memorandum of Law, and the Cordry Declaration, violates the Extension Order and mandates that strong measures be imposed on the Debtor and Redmond to remedy those violations.

As more fully set forth in the TRO Memorandum, the attached Memorandum, and the Adversary Complaint, the Debtor and Redmond engaged in conduct in violation of the Extension Order:

1)    by failing to make required deposits into the 2010 Segregated Account after entry of the Extension Order,

---

[4]    The Movant States reserve their right to amend this motion to assert further theories of contempt as warranted.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2)      by removing funds from the 2008, 2009, and 2010 Segregated Accounts after the date of the Extension Order, thereby effectively violating the requirement that funds be deposited therein;

3)      by failing to make the required annual transfers to the State Escrow Accounts on April 15, 2010, and the required quarterly transfers on our about April 30, 2010, so as to satisfy the requirements for those deposits under the Movant States' escrow deposit statutes, and

4)      by failing to replace funds improperly removed prior to the Extension Order so that Debtor would be able to satisfy its obligations under the Movant States' escrow deposit statutes.

The removal of the funds from the Segregated Accounts, the failure to make timely deposits into the account, the failure to return the funds, and the consequent failure to make timely transfers to the Movant States' Escrow Accounts all fly in the face of language in the Extension Order that was intended to preclude exactly those possibilities.  In light of that flagrant violation, a finding of contempt is warranted and necessary to ensure that strong and effective sanctions can be imposed on the Debtor and Redmond to require them, jointly and severally, to take the steps necessary to comply with this Court's orders.

**WHEREFORE**, for all the foregoing reasons, and such additional reasons as may be advanced in the attached Memorandum and at or prior to any hearing on this Contempt Motion, the Movant States request that the Court enter the attached PRO applying to the assets of Redmond and consolidate any briefing or hearing on this Contempt Motion with any briefing or hearing in the Adversary Proceeding.  The Movant States further request that the Court enter the attached show cause order requiring the Debtor and Redmond to appear before the Court and answer why they should not be held liable in contempt for the violations set forth above.  Finally, the Movant States request such other appropriate relief as is warranted to remedy the violations set out herein, including the imposition of compensatory and coercive sanctions, and the assessment of joint and

1    several liability against the Debtor and Redmond for attorneys' fees and costs incurred by the

2    Movant States in bringing this action.

3    Dated:    May 14, 2010                    PACHULSKI STANG ZIEHL & JONES LLP

4

5                                        By    */s/ Pamela Singer*
                                               Samuel R. Maizel (CA Bar No. 189301)
6                                              Pamela E. Singer (OR Bar No. 89423)
                                               150 California Street, 15th Floor
7                                              San Francisco, California  94111-4500
                                               Telephone: 415/263-7000
8                                              Facsimile:  415/263-7010

9                                               -- and --

10                                         NATIONAL ASSOCIATION OF
                                              ATTORNEYS GENERAL
11
                                           Karen Cordry (DC Bar No. 278051)
12                                         Attorneys for the States

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  Samuel R. Maizel (CA Bar No. 189301)
Pamela E. Singer (OR Bar No. OSB 89423)
2  PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
3  San Francisco, California 94111-4500
Telephone: 415/263-7000
4  Facsimile: 415/263-7010

5  Karen Cordry (DC Bar No. 278051)
National Association of Attorneys General
6  2030 M Street, N.W., 8th Floor
Washington, DC 20036
7  Telephone: 202/326-6025
Facsimile: 202/331-1427

8  Attorneys for Alabama, Alaska, Arizona, Arkansas,
California, Colorado, Georgia, Idaho, Indiana, Illinois,
9  Kansas, Kentucky, Louisiana, Maine, Maryland,
Massachusetts, Michigan, Missouri, Montana, Nebraska,
10  Nevada, New Hampshire, New Jersey, New Mexico, New
York, North Carolina, North Dakota, Ohio, Oklahoma,
11  Oregon, Pennsylvania, Rhode Island, South Carolina, South
Dakota, Tennessee, Utah, Virginia, Washington, West
12  Virginia, and Wyoming, and the District Of Columbia

13  UNITED STATES BANKRUPTCY COURT

14  DISTRICT OF OREGON

15  In re:                          Case No.: 05-34156-elp11

16  Carolina Tobacco Company,        Chapter 11

17            Debtor              **DECLARATION OF KAREN CORDRY IN SUPPORT OF**
18                               **MOTION FOR AN ORDER TO SHOW CAUSE WHY THE DEBTOR AND**
19                               **DAVID REDMOND SHOULD NOT BE FOUND IN CONTEMPT OF**
20                               **"EXTENSION ORDER"**

21

22     I, Karen R. Cordry, hereby declare and state as follows:

23     1.    I am the Bankruptcy Counsel for the National Association of Attorneys General and

24  have served as representative of those of the Settling States (i.e., the States that are signatory to the

25  tobacco Master Settlement Agreement) that have had dealings with Carolina Tobacco Company

26  (hereinafter "CTC" or "Debtor") since its inception (hereinafter "the States") during the Debtor's

27  bankruptcy proceedings. I make this declaration based on my personal knowledge of those matters

28  hereinafter set forth and, if called as witness, I could and would testify competently thereto under

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

oath.  I file this Declaration in support of the *Motion for an Order to Show Cause Why the Debtor and David Redmond Should Not Be Found in Contempt of "Extension Order."*

2.     The Debtor's bankruptcy case was precipitated by its failure to make the statutorily required annual escrow deposits in April 2005 for its sales during calendar year 2004.  Its President, Mr. David Redmond, stated during the case that the purpose of the filing was to forestall the efforts he predicted that the Settling States would take to remove CTC from their directories of products approved for sale in those States, based on the failure to make those deposits.

3.     Early in the case, the Debtor sought to use estate assets to purchase additional equipment for use in its South African manufacturing facility.  The Settling States opposed that motion, at least in part, because of the concern that funds that should be used to bring the Debtor into compliance with their escrow deposit laws would be diverted to the purchase of that additional equipment.  (By the Debtor's admission, the initial failure to make the escrow deposits in April 2005 was caused in large part, because of its use of cash assets to buy its initial operating equipment for its South Africa operations prior to the bankruptcy filing.)

4.     In order to alleviate the States' concern that the Debtor would operate in the case without making adequate provision for payment of the administrative expenses accruing for the required escrow deposits for sales made during the case, the Debtor agreed to entry of an order requiring monthly deposits into a segregated account covering those escrow deposit obligations. *See* **Exhibit A**, pars. 4-6, Order, dated June 3, 2005, which will be submitted separately in a separate binder (the "Exhibit Book") and which is a true and correct copy of the *Order on Debtor's Motion to Purchase Equipment for Johannesburg Facility* [Docket No. 78].  That Order required monthly deposits for sales during the prior month, and transfers from that segregated account to the States' statutory accounts.  For States that required deposits to be made on a quarterly basis, the transfers were to be made in accordance with that statutory schedule.  It also provided that, if the Debtor wished to assert that it was unable to make the payment, it was to give the States advance notice and they could move for an expedited order requiring the payments be made despite the asserted impossibility defense.

5.      In fact, the Debtor did make the required deposits into the segregated account throughout the case prior to confirmation and made the required transfers to the States' statutory escrow accounts during the period between June 2005 and February 2006.

6.      During the confirmation process, the States became extremely concerned about the declining sales of the Debtor and whether its failure to meets its budgetary projections while operating in bankruptcy would make it impossible for it to meet the terms of its proposed plans, which called for the Debtor to use its profits over the next several years to pay back the States and the other creditors in the case (virtually all of whom were governmental entities).  They were also concerned to ensure that funds were not diverted from the Debtor's operations relating to the United States to fund its operations in South Africa for use in making overseas sales or that funds would be diverted to Mr. Redmond personally.  Finally, since the Debtor's ability to repay the States and other creditors turned on, and was gauged by, the reported profitability and cash assets of the Debtor, the States were also deeply interested in ensuring that the Debtor's revenues would only be used for proper purposes, would not be squandered on excessive compensation, and could be adequately monitored by the States during the several-year payout period contemplated by the Debtor's plans.

7.      The States accordingly proposed a substantial number of provisions to be added to the Debtor's proposed plan as operating constraints.  This Court's decision on February 1, 2006 required the inclusion of some, but not all, of those requirements.  On page 37 of this Court's opinion discussing confirmation of the plan (a true and correct copy of which is set forth as **Exhibit B** in the Exhibit Book), the Court first agreed with the Debtor that it was entitled to satisfy the escrow deposit obligations more slowly than promised in its plan if it were not financially able to meet that schedule, but must also include provisions providing for a faster payoff it its profits were higher than projected, because while the deposits were not made, the Debtor was being allowed to operate in violation of state law and that should not continue any longer than necessary.  *See also* page 41 of the Opinion (defined below) where this Court held that the plan would be fair and equitable *if* the Debtor was required to make up the delinquencies as quickly as feasible.  A true and correct copy of the *Order Confirming Debtor's Third Amended Plan of Reorganization Dated October 18, 2005 (as*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

*Modified February 24, 2006)* and pertinent excerpts of the *Court's Memorandum Opinion Re Confirmation of Plan* are included in the Exhibit Book as **Exhibit B**.

8.       This Court specifically stated at page 37:

> I will also require the plan to provide that, during the life of the plan, debtor set aside monthly the amounts necessary to meet the escrow deposit requirements for postpetition sales. *This will provide additional assurance to the states that debtor will not use funds necessary to satisfy the postpetition escrow deposit requirements as working capital* or to pay prepetition claims.

(Emphasis added).

9.       Starting at page 42 of its Opinion, this Court went on to note the various provisions proposed by the State that it was requiring to be contained in the Debtor's plan before it would be confirmed.  Those provisions, and others previously agreed to by the Debtor, appear in Sections 6.02 "Management of the Reorganized Debtor" and 6.09 "Financial Constraints" of the debtor's plan as confirmed on February 24, 2006 (the "Plan").

10.       Article 6.02 imposes various reporting requirements on the Debtor, including quarterly reports on past operations and projections of future operations.

11.       Article 6.09 begins:

> For so long as any amount remains unpaid under Articles . . . 4.04 [escrow deposits] and 4.05 [States' penalty claims] of this Plan, and in order to ensure that the full amounts owed to the creditors are paid as required, the following operational and budget constraints shall be recognized and operated under by the Debtor and shall be deemed a material requirement in determining the Debtor's available cash balances on the due date under the Plan. Any changes in the provisions below may only be made after notice and a hearing.

Article 6.09(a) adds that "The Debtor shall make every reasonable effort to operate and expend funds in accordance with the projections in Exhibit 3."

12.       Articles 6.09(b)-(g) limit the changes in compensation and other payments to be made to Mr. Redmond and his affiliated companies and Article 6.09(i) provides a means of calculating the added payments to be made if the Debtor's profits are in excess of its projections.

13.       Finally, Article 6.09(h) contained the following language continuing the requirement to segregate funds:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(h) The Debtor shall segregate the amounts necessary to pay all NPM escrow obligations by the 15th day of each month for the previous month's sales. Twice each calendar year, the Debtor shall have the right, with five (5) days' prior written notice to the Designated Parties, to delay segregation of payments for fifteen (15) days. The Debtor shall also have the right to move the Court to excuse compliance with this financial constraint.

After the required changes were made to the Debtor's plan, this Court issued its confirmation order on February 24, 2006.  In that Order, this Court ordered that "having determined, as set forth in its Memorandum Opinion entered on February 1, 2006 (the "Opinion"), a copy of which is attached hereto and incorporated by this reference as Exhibit 1," that the confirmation requirements were met by the Debtor's plan as amended, the Plan was confirmed and that the Court retained jurisdiction over the case in accordance with Article IX of the plan as confirmed (the "Plan").

14.    Article IX provides, *inter alia*, that the Court retains jurisdiction to resolve controversies and disputes regarding the implementation of the plan, to implement the Plan provisions and enter orders in aid of confirmation, and to adjudicate all adversaries and contested matters arising in the case.

15.    Following plan confirmation, the Debtor did make the required deposits into a segregated account (a different account for each sales year) and transferred amounts on a quarterly and annual basis to the statutory escrow accounts of the Settling States in which it did business. While there may be some discrepancies with respect to the amounts deposited and transferred for individual States, as a general matter, there were no issues with respect to those deposits and payments through all of the sales year 2008 and for the quarterly deposits for sales year 2009. Indeed, the Debtor even made full and timely deposits for sales year 2005, even though a portion of that year occurred prior to the petition date.

16.    After confirmation, the Debtor filed certain financial reports that I receive and review. On a monthly basis, it filed a "Post-confirmation Disbursement Report" (*see* **Exhibits C** and **M** for true and correct copies of the most recent such reports for February and March 2010, in the Exhibit Book).  Those documents show the beginning and ending balance in each account (including the annual segregated accounts) and global amounts numbers for the transfers in and out of those accounts.  No further information is provided with respect to the segregated accounts, including

specifically any statements as to how many separate transactions comprised the "transfers out," and whether they were being made for quarterly deposits, annual deposits, or any other purpose.

17.    In addition, I receive, on the States' behalf, a quarterly report in the form of the UST-11 and 12 forms, showing, on a monthly basis, revenues and expenses, including specifically an entry for the amounts being paid out for "NPM expense," i.e., the escrow amounts.  It is possible to correlate the amounts shown on that form for the NPM expense in a given month, with the deposit into the segregated account of that same amount the following month.  A review of the monthly and quarterly statement appears to indicate that the required deposits were made into the account each month through 2009 and the first three months of 2010.  These reports are received at the end of the month for the prior month or quarter.  Thus, the "February" report is received at the end of March and relates to bank balances at the end of February 2010.  The deposit shown into the 2010 account would be for sales in the month of January 2010 and would be reported on the quarterly statement I receive under the January receipts and expenses column.

18.    That February 2010 disbursement report is the last such report I received prior to the April 15, 2010, when the annual deposits for 2009 sales were received.  I have repeatedly requested that the Debtor provide these in a more timely fashion as we have attempted to engage in negotiations over the last few months but have received no response.

19.    I also receive a quarterly set of projections from the Debtor's accountants with respect to whether the Debtor is able to make payments toward the amounts owed under the Plan.  The most recent such statement was dated April 7, 2010, and covered the period through March 31, 2010.  It contains information on the debtor's operating bank accounts, but not the segregated accounts, so they are not a basis of updated information on the status of those accounts.

20.    Beginning in the fall of 2007, I engaged in discussions with the Debtor's counsel (Ms. Salyer and Ms. Schleicher) with respect to a possible settlement structure that was intended to bring the Debtor into compliance substantially more quickly than might otherwise be possible under its Plan.  Those discussions were based on the possibility of applying Allocable Share Releases ("ASRs") that the Debtor would receive from the State of Missouri to the unpaid escrow balances owed from the 2004 sales.  Those ASRs were not referenced in the plan projections, and had not

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

actually been received by the Debtor for several years at that time, so it appeared that the Debtor was able to operate without them and, hence, they would be a windfall source of funds for compliance under the Plan.

21.   Based on that assumption, I worked with Debtor's counsel to structure a modification to the Plan's terms based on the use of the ASRs. Those negotiations took a very long time to come to fruition due in part to the Debtor's need to resolve issues with creditors other than the States. During that time period, it emerged that the Debtor could not operate fully without the use of the ASRs, but, rather needed to use at least some of those funds to supplement its normal operating income. Despite that fact, it still appeared that the Debtor would be able to fund the modification and complete its compliance with its 2004 obligations. As a result, the parties executed the plan modification (the "Plan Settlement") in the summer of 2009. This Court entered its formal approval of the Plan Settlement on October 8, 2009, although it had indicated at an earlier hearing that it would do so after proper notice of the Plan Settlement was provided to other creditors in the case.

22.   Unfortunately, when the attempt was made to implement that settlement, the States determined that the excess funds held by the Debtor in 2003 were insufficient to allow satisfaction of the full escrow deposit balances for 2004, a problem that the States asserted was based on a mutual mistake by the parties in calculating the amount of those excess funds. The Debtor contested that position and claimed that the settlement was premised on reducing the amounts owed for 2004.

23.   After that dispute emerged, the parties attempted to resolve the dispute consensually with the States taking the position that they could agree to provide somewhat more time to the Debtor to come into compliance but they were not statutorily authorized to waive any portion of the amounts that were owed.

24.   While those discussions were going on, the Debtor's counsel indicated to me at the end of January 2010, that Mr. Redmond believed that there had been a "conditional dismissal" of the case, pursuant to the plan modification agreement approval in October and, based on that "conditional dismissal," he thought he was not necessarily obligated to continue placing money into the segregated account.

25.     I responded to that suggestion by email on January 27, stating:

> Finally, I have looked at the settlement documents again. They most
> assuredly do NOT provide for any sort of "conditional dismissal" of
> the case. It is quite clear that the only step is a FINAL dismissal order
> and that is not to be entered until after all 2004 escrow deposit
> payments have been made in full and that has not happened yet.
> Accordingly, it is absolutely not correct for Carolina to unilaterally
> cease abiding by the monthly escrow requirement.

26.     It is my recollection that Debtor's counsel agreed with my position after receiving that email and told me they had informed Mr. Redmond that he could not stop making deposits. And, indeed, the disbursements reports for all months from October 2009 through February 2010 (and indeed the March 2010 report received after the events at issue herein), show appropriate deposits being made. I was given no information that would suggest that any amounts were being removed from the accounts after an initial deposit was made (other than for the established purpose of making transfers to the State Escrow Accounts) escor that anything was occurring with these accounts that was not in accordance with the Plan or the Debtor's actions over the last several years. Moreover, the quarterly deposits for the fourth quarter of 2010 were transferred without incident at the end of January 2010 and I received no reports from any State that the required deposit transfer had not been made.

27.     I continued to engage in additional discussion with the Debtor's counsel in February 2010, but it became clear that the Debtor could not or would not agree to make up the full deposits for 2004 and that it would continue to claim that it was excused from doing so by the Plan Settlement.

28.     On March 2, 2010, accordingly, at a status conference, I informed this Court that the States were prepared to move forward with a motion to rescind this Court's approval of the Plan Settlement. At that time, the Debtor's counsel asserted that the Debtor was ready, willing, and able to implement the literal terms of the Plan Settlement. The court set a date of April 5 for the filing date for the States' rescission motion.

29.     Following that assertion by the Debtor, I decided to review whether it would in fact be likely to be able to fund even the reduced amount that it claimed was owed under the Plan modification. The January 6, 2010 report prepared by the accountants contained an analysis of how

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the amounts owed under the agreement would be satisfied according to the Debtor. *See* **Exhibit D**, Assumption 24, which is a true and correct copy of the foregoing report, set forth in the Exhibit Book.

30. The accountant asserted that approximately $2.125 million would come from the ASRs from Missouri and North Dakota contemplated by the modification agreement, and another $519,674 from "working capital." My analysis indicated that the accountant's approach to the ASR funds suffered from the same "double counting" issue that had caused the original problem with the Plan Settlement. But, even apart from that problem, the February disbursement report indicated that the Debtor had less than $500,000 total in unencumbered cash. Thus, if it needed more than $500,000 to fund the settlement, this would leave it with a negative balance of operating funds.

31. After completing that analysis, I presented it to Debtor's counsel and explained that, in my view, the Debtor had no more options – even under its own terms, it could not satisfy the Plan Settlement and the States, accordingly, had a clear basis to have the agreement voided due to impossibility of performance by the Debtor. Moreover, I asserted, the Debtor plainly could not now (and never could) comply with the terms of the original Plan that it had demanded be confirmed over the States' objections. Absent such compliance, and absent any viable Plan Settlement modification, the States should shortly be free to move to delist the Debtor for failing to make those 2004 deposits. Under the circumstances, I indicated the only logical step for the Debtor was to withdraw from operations in the United States and concentrate on its overseas markets unless and until it could ever find the funding to bring itself back into compliance.

32. After consultation with the Debtor, its counsel, Mr. McKittrick, advised me that the Debtor was prepared to adopt such an approach and provided me with a draft term sheet for such a withdrawal. *See* **Exhibit E**, which is a true and correct copy of the draft term sheet, set forth in the Exhibit Book.

33. The drafting of that term sheet was somewhat ambiguous, but I clarified with Mr. McKittrick that the Debtor's basic proposal was that it would agree to make full payment of the escrow deposit balances and penalties the States claimed were owed for 2004 by assigning to the States the Debtor's right to receive interest on its escrow accounts. While such payments were being

made, the Debtor would withdraw from the United States market and would not seek to return until it had brought itself back into full compliance.

34.     There is approximately $65 million in those accounts (*see* **Exhibit N** of the Exhibit Book, which is a true and correct copy of the Debtor's *April 26, 2010 Statement of Cash Positions*) and, pursuant to the States' escrow deposit laws, the earliest time that any of those funds could revert to Mr. Redmond and the Debtor would be April 15, 2029 (25 years from the deposit date of April 15, 2004 for sales made during calendar year 2003).  Even in today's low interest rate environment, a judicious use of longer-term Treasury notes would produce substantial payments that could be used to bring the Debtor into eventual compliance.  The States were not willing to voluntarily allow the Debtor to operate in the United States in further violation of their laws for an extended period past the December 2009 date in the Plan.  There appeared to be no reason, though, why they could not accept the Debtor's offer to use the interest payments to complete those obligations over time so that it might eventually be able to return to the United States after it had ceased its violation of their laws.

35.     In light of what appeared to be a promising way to finally bring a resolution to these long-pending issues, the States agreed with the Debtor that a short extension should be sought for the filing of their rescission motion to allow the parties to complete the drafting of the wind-down agreement.  Among other reasons for the delay were the planned vacation of the Debtor's counsel and the terminal illness of Mr. Redmond's brother.

36.     In order to ensure that the States would not be prejudiced by the delay and to ensure that there was no repetition of the January discussion about whether the segregation requirement still applied, the States insisted that the joint extension motion and stipulated order both explicitly refer to the escrow requirements.  (*See* **Exhibits F** and **G**, which are true and correct copies of the foregoing documents, set forth in the Exhibit Book.)  In particular, this Court's March 29 order (the "Extension Order") stated:

> Until further order of this Court, the Debtor remains subject to the prior orders of this Court and the provisions of its confirmed plan regarding monthly escrowing for its ongoing sales, and further remains obligated to obey the escrow deposit laws of the Settling States, including the obligation to make full deposits on April 15, 2010 for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    sales during the 2009 sales year and to file certifications by April 30,
     2010 with respect to its ongoing sales in calendar year 2010.
2

3    **Exhibit G** in the Exhibit Book.

4        37.    Following entry of that order, I continued in discussions with the Debtor's counsel to

5    flesh out the terms of its proposal including the logistics of how the assignment of the rights to the

6    interest payments would work, how long the Debtor would be allowed to sell, and when its

7    agreement to a voluntary delisting would take effect after it ceased its sales operations.  In our

8    discussions, it was clear that the Debtor would be allowed to make sales to distributors and to have

9    its products remain on the shelves only so long as it was in compliance with its statutory obligations

10   to make escrow deposits as recognized in this Court's order for its ongoing sales in 2009 and 2010.

11   If those deposits were made, I noted in the discussions with the Debtor, the States would not be

12   condoning any new or further violations of their escrow laws and thus could allow them to continue

13   to operate for a short time despite the remaining delinquencies from the 2004 sales year.

14       38.    While the discussions were slowed somewhat by Mr. Redmond's personal concerns

15   relating to his brother, they appeared to be making good progress during the first two weeks of April.

16   I was working with the States to finalize their sales numbers so that they could determine exactly

17   what credits would be available to reduce the amounts still owed for 2004 for the escrow balances

18   and the penalties.  By my calculations, without using any operating funds, and without reliance on

19   any Allocable Share Release from Missouri for 2009 sales, it appeared that there might be as little as

20   $1.25 million in escrow balances remaining to be paid from the interest funding.

21       39.    On April 15, 2010, I emailed Ms. Salyer at 11 a.m. Eastern time to verify that the

22   2010 deposits had been made for the annual states and to renew my request for certain information I

23   had previously requested.

24       40.    I did not receive a response on April 15.  However, on April 16 at approximately

25   10:30 a.m. Eastern time, I received a call from Ms. Salyer who indicated that she had just been

26   informed by Mr. Redmond that the Debtor had not made the required deposits on April 15.  She

27   stated that he had told her that he had been concerned about his trade creditors and that, on the

28   assumption that the States would be able to obtain their payments from the assignment of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

interest, he had concluded that it would be better for him to use the funds in the 2009 segregated account to pay his trade creditors rather than the States.

41.    From that point through Monday, April 26, I repeatedly requested from the Debtor's counsel that they provide me with information about these transfers, the state of the Debtor's accounts, what the removed funds were used for, and the like, and finally began receiving the information in small bits, primarily starting on Thursday, April 22.  Debtor's counsel informed me that they passed on the requests to Mr. Redmond (with whom they stated they were engaged in daily conversations and meeting), tried to obtain the information, and provided it as quickly as the Debtor and Mr. Redmond would provide it to them.

42.    The States were informed on Monday, April 19, that the funds that were not transferred into the escrow accounts for 17 States totaled more than $2 million.  *See* **Exhibit H**, a true and correct copy of which is contained in the Exhibit Book, totaling the delinquent amounts. No information was provided then or after several more requests about what was done with the funds that had been removed from the segregated account.

43.    At 2:15 on Thursday, April 22, I finally received copies of the monthly statements for the 2009 Segregated Account that showed the actual separate transfers into and out of that account. When I opened the monthly statement for August 2009, I noted that it showed a withdrawal on August 14 of $500,000 and a deposit on August 28 of $500,000.  That removal and return of funds in a large, round numbers seemed odd but the statements did not identify who the transfer was made to. A separate document entitled, "Detail of Banking Activity," (a true correct copy of which is **Exhibit I** in the Exhibit Book), though, made clear the nature of those transfers – and others that occurred throughout the rest of 2009 and 2010.

44.    That document showed that the Debtor had removed $500,000 in each of August and September 2009 as "Loan to CTC Operations" and then repaid the amounts by the end of the month. (Doing so would, of course, ensure that the transfers would not show up in the starting and ending balance of the accounts.)

45.    Starting immediately after this Court announced in September 2009 that it would approve the Plan Settlement, the Debtor began permanently removing huge sums of money from the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

segregation account without replacing them.  In October, $1 million was removed; in November, another $500,000; in December $1,300,000 (of which $500,000 was listed as being repaid in December); and in January another $500,000.  Each of those removals was labeled as a "Loan to CTC operations."  After those removals, the balance in the 2009 segregated account was only about $365,000 as of the end of January.

46.    Thereafter, one final withdrawal was made on April 2, 2010 for $364,500, to pay one of the Debtor's materials suppliers.  That payment was made only four days after this Court entered the Extension Order that had explicitly ordered the Debtor to obey its obligations under the Plan and the Plaintiffs' escrow deposit statutes.  Following that payment, the Debtor retained only $558.20 in the 2009 account – an amount monumentally insufficient to satisfy the more than $2 million that would come due less than two weeks later.  The States were told nothing of this violation of the March 29 order at the time it occurred.

47.    I was next informed by Debtor's counsel on April 23 at 2:40 p.m. Eastern time that all but some $500 of the $1.1 million held in the 2010 Segregated Account (covering sales for January and February) was also removed by the Debtor on April 2, 2010.  Further, no deposit was made for March sales on or about April 15, in further violation of the Plan and the Extension Order.  *See* **Exhibit J** of the Exhibit Book, which is a true and correct copy of the foregoing detail provided by the Debtor.

48.    At no time prior to the revelations on April 22 and 23 was I ever informed that such removals were taking place from either the 2009 or 2010 Segregated Accounts.  To the extent that there was a discussion in January about the debtor not being obligated to make the escrow deposits (a contention that was incorrect under the Plan Settlement), it came long after most of the payments had already been removed from the 2009 account and did not in any way suggest that the Debtor was making the deposits and then removing the funds.  Since the reports indicated that the Debtor did continue to make the deposits each month, I had no reason to believe there was an issue with respect to the funding of the Segregated Accounts.

49.    Even had the Debtor replaced the funds promptly and borrowed them only for cash flow purposes, this would have been in violation of the Plan provisions that allowed the debtor to ask

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to delay the deposit obligations twice a year (see paragraph 6, above).  Nor did the Debtor ever ask the Court for permission to be relieved from the segregation obligation pursuant to those same Plan provisions.  Nothing in the quarterly operating reports prepared by the Debtor provided any notice of these removals, nor did the projections prepared by the accountants discuss such removals.

50.     At about 4:15 pm Eastern time on April 23, I finally received information (*see* **Exhibit K** of the Exhibit Book, which is a true and correct copy of an email that I received) from Debtor's counsel responding to my repeated question as to how the removed funds had been used; i.e., which "customers" the Debtor thought should be paid in preference to the escrow deposit obligations and to whom the removed funds had been paid.  (That exhibit does not provide any information on the August and September removals, perhaps on the theory that those amounts had been repaid.)

51.     **Exhibit K** shows that the removed funds were not used solely to pay trade creditors.  Rather, it appears the withdrawals were purportedly taken to deal with amounts owed to the United States for Excise Taxes and Customs Bond collateral and to make NPM Escrow Deposits.

52.     That is, the Debtor was removing amounts on a given day and then later that same day or shortly thereafter returning those funds in whole or in part to the segregated account to satisfy the next month's escrow deposit obligations.  For example, on October 14, $750,000 was removed and the exhibit notes that the Debtor owed $317,834.98 to the United States on that date, and that a balance of $814,159.61 was owed and deposited for September sales.  Assuming all of the funds were applied to the payment to the United States, that left $432,165.02 to be recycled back into the account as part of the $814,159.61, so that only an additional $381,994.59 in new money was actually deposited.  That is a best case scenario for the deposits – if all of the $750,000 was used for the escrow deposits, only $64,159.61 in new money would have been deposited.  The States do not yet have sufficient information to resolve those details.  As noted, no deposit at all was made for March 2010 sales.

53.     In using this recycling process, the Debtor did not comply with the terms of the Plan, and the Extension Order which require deposit of the full amounts owed for the prior month's sales,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  rather than recounting the same deposits more than once, and clearly violate the bases for the

2  inclusion of such provisions, as stated in this Court's confirmation opinion.

3       54.    Moreover, although **Exhibit K** was presented to show that the removed amounts were

4  being used for proper operational purposes, it does not establish that.  The Debtor's quarterly reports

5  (*see* **Exhibit L** in the Exhibit Book for a true and correct copy of the fourth quarter 2009 report)

6  showed sufficient revenue from the sale of cigarette products to ostensibly fully cover placing of

7  new amounts into the escrow accounts each month.  (At worst, the report shows a purported net loss

8  of $163,802 for the year, although that amount, on a cash flow basis, is inflated by the deduction of

9  interest that is being accrued but not actually paid.)

10      55.    A review of **Exhibit K** suggests that a minimum of $775,000 of deposits referenced

11  as being made for 2009 sales were actually made only by way of recycling and relabeling existing

12  deposits.  (The amount could be far higher depending on the allocation of the withdrawn funds

13  between escrow deposits and payments to third parties.)  If so, then the deduction of that same

14  $775,000 (or more) on the December 2009 quarterly report was not warranted and the Debtor should

15  be showing substantial profits for that quarter.  If those profits do not exist, then it appears there are

16  serious questions about the operating statements filed by the Debtor and the States need substantially

17  more information in order to be able to understand what occurred.  Certainly, nothing in the

18  quarterly operating reports made mention of any "loans to CTC Operations" or repayments thereof.

19      56.    The Debtor also had, as of February 2010, about $26,000 in its 2008 segregated

20  account, and over $450,000 in an account provided for under the modification agreement for funds

21  to be used in completing that agreement.  The Debtor also had about $500,000 in unencumbered

22  cash in its accounts in the United States and South Africa combined at the end of March 2010,

23  according to the accountant's report.

24      57.    After repeated requests, I received, on Monday April 26, additional information from

25  the Debtor.  (**Exhibit N**, which is a true and correct copy of the April 26, 2010 Statement of Cash).

26  This sheet shows the Debtor's "Cash Position" as of April 26, 2010.  That sheet indicates that the

27  Debtor had just over $600,000 in its United States bank accounts at the end of March but also shows

28  that, as of the present date, the debtor has removed all but $9900 of the $457,000 plus that was held

in the Plan Settlement escrow account and there was a zero balance in the 2008 Segregated Account. That information was the first time that I was able to confirm that those funds had been removed as well – in violation of the terms of the Extension Order, the Confirmed Plan provisions for the Segregated Accounts, the Plan Settlement approved by this Court, which established the bases for removal of funds from that account, none of which has occurred. Again, these removals were made without any notice to me or the States. Bank statements later received indicate that the 2008 funds were also removed on April 2, and that the Settlement Escrow Account Funds were not removed until April 16 – the day after the Defendant failed to make its April 2010 escrow deposits.

58.    **Exhibit N** further shows a blank for amounts intended to be paid in the coming weeks for "NPM Payment – 2010" despite the fact that the Debtor is obligated to transfer quarterly payments at the end of April for most States in which it operates, and to continue to make deposits into the 2010 Segregated Account for its 2010 sales that it projects in that Exhibit.

59.    According to **Exhibit N**, the Debtor intended to pay $1,067,718.94 to other parties over the following four weeks, while its escrow deposit obligations were unsatisfied and would continue to grow. At the end of that time, it stated it would have reduced the $600,000 to approximately $265,000 (although the calculations on that sheet do not clearly add up to that number), while the delinquent escrow obligations would have swollen considerably if those sales had taken place.

60.    Thus, under this approach, the Debtor will have eliminated virtually all of its unencumbered cash in the United States, while creating even more unsatisfied escrow deposit obligations. It has other bank accounts, though in South Africa, which are not set out on this chart which does not indicate whether the funds were transferred there. Absent injunctive relief from this Court, there is nothing that prevents the Debtor from withdrawing all of those funds, transferring them to South Africa, and leaving them there while failing to make the required escrow deposits. The Debtor's conduct to date, as described in detail above, shows that it has and likely will continue to withdraw any available funds without authorization.

61.    The Defendant is in the process of terminating its operations in the United States. It started the process on a consensual basis when it became clear that it could not comply with the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

terms of the modification agreement to the Confirmed Plan, even if interpreted according to its view. That process has now accelerated as the States where the Defendant failed to make the April 15 payment have moved to delist it.  The Debtor has every incentive to remove any remaining funds in its United States accounts and transfer them to South Africa where they will effectively be beyond the Plaintiff's ability to enforce their laws against those funds.

62.    In light of those facts, the Plaintiffs believed that any attempt to give notice to the Defendant and Additional Defendant prior to obtaining the requested TRO would only allow those entities to take further steps to remove their assets from the effective control of this court.  For those reasons, the Plaintiffs did not give notice to the Defendant or Additional Defendant or their counsel of their intention of seeking the TRO.

63.    In his capacity as sole owner and President of the Debtor, it has been my observation throughout the case that David Redmond exercises plenary authority over all decisions regarding the operations of the Defendant, including but not limited to, directing the deposit and removal of funds from the Defendant's bank accounts, and determining what debts will be paid from the Defendant's assets.  It is also my understanding from the statements of his counsel that he insists on closely reviewing all documents and orders, discusses their terms with counsel in great depth, and insists on personally approving in advance all statements and pleadings made or filed by them that are given to the States or the Court.  Even during the recent time period of his brother's illness, they have informed me that they have communicated all matters to him and received his approval for any filings they have made with the court, including the joint extension motion filed on March 29, and the terms of the consent extension order entered in connection with that motion.

64.    I was informed by the Debtor's counsel that it intended to notify all of its customers by on or about April 26, 2010, that it would not make further sales after May 15 at the latest, or such earlier dates as it is delisted from state directories.  I have further been informed by the Debtor's counsel that it has ceased manufacturing product for the United States market.

65.    On May 5, 2010, pursuant to the adversary complaint, the Court entered its Preliminary Injunction Order imposing various duties on the Defendant and its principals, officers, agents, attorneys, employees, servants, and all persons acting in concert or participation with any of

them as provided under Rule 7065.  Among those duties were the obligation to return immediately the Funds within the present possession or control of the Defendant, and its principals (including specifically the Additional Defendant and to take all reasonable steps to ensure that the Defendant and persons acting in concert or participation with the Defendant return or repay the funds to the Segregated Account.

66.     As of March 30, 2010, the March Post-Disbursement Report (a true and correct copy of which is **Exhibit M** in the Exhibit Book) shows that the Defendant had only about $125,000 in unencumbered funds in its South African accounts.  As of April 30, 2010, a statement of the Defendant's cash balances, provided to the Plaintiffs under the Preliminary Injunction Order (a true and correct copy of which is **Exhibit P** in the Exhibit Book) shows that the Defendant had more than 8.8 million Rand in its South African accounts.  The current exchange rate for the Rand is approximately 7.5 to the dollar, so that translates to approximately $1.175 million as of April 30, nearly a $1 million increase.  At no prior time from January 1, 2009 to the present has the Defendant ever ended a month with any similar amount in South Africa, based on its Post-Disbursement Reports.  In December 2009, it had $644,000, in February 2009, it had $318,000 and no other month exceeded $300,000.  Most months were between $150-250,000, and a number of months had less than $100,000 in those South African accounts.  *See also* **Exhibit O** in the Exhibit Book, which is a true and correct copy of a Debtor's Quarterly Report.

67.     On May 13, the Plaintiffs received a copy of the bank statement for that South African checking account (a true and correct copy of which is **Exhibit Q** in the Exhibit Book).  That statement shows three transfers in from the Defendant's Carolina's United States banking accounts – one on April 8 for 6.179 million Rand, one on April 212 for 3.329 million Rand and one on April 26 for 3.916 million Rand, for a total of $13.424 million Rand.  At the same 7.5 Rand exchange rate, that totals to $1.79 million in the month of April.

68.     Examinations of earlier months shows that no large transfers were received from the United States in March, 2010; about 1.9 million Rand in February, about 750,000 Rand in January, about 6.2 million Rand in December, about 1.3 million Rand in November, about 4.6 million Rand in October, about 2.3 million Rand in September, 1.9 million in August, nothing in July 2009 and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

nothing in June 2009. Thus, the large transfers appear to have begun when the Defendant began making removals from the Segregated Accounts. Even then, the amount transferred in April 2010 dwarfed any previous amounts. .

69.    I have been informed on May 13, 2010, that the Defendant is in the process of repatriating some funds from South Africa. I am not aware of the basis of the Defendant's calculation as to the amount of such funds that are being returned.

70.    To my knowledge, the Defendant has taken no other affirmative steps to attempt to repay the funds owed to the Segregated Accounts. In particular, based on prior information presented during the case, it is my understanding that the Defendant owns five lines of manufacturing equipment. Three of those lines make 100-mm cigarettes – which the Defendant has stated are essentially sold only in the United States market. Two make 84-mm cigarettes, which can be sold in the international market.

71.    According to the Defendant's records, it sold a total of 22,000 cases last year in the overseas market; this year it has sold 9500 cases in the first three months. Assuming that could be extrapolated to the whole year, it would sell about 38,000 cases overseas. According to production schedules contained in prior projections supplied by the Defendant's accountants, either of its 84-mm machines can make approximately 8,000 cases a month. Thus, at most, the Defendant only needs one machine to make far more product than it can reasonably hope to sell this year or in the foreseeable future. The Defendant has projected large overseas sales since 2006; the reality has been a very slow growth of those sales from 4,000 cases in 2006, to 8158 in 2007, 14,0367 in 2008 and 22,163 in 2009. Thus, even assuming it is appropriate to allow the Defendant to continue to operate a business in South Africa while it is deeply in default in the United States, it only needs one line to do that, not five, by its own calculations.

72.    The Defendant promised that it would sell one line of equipment (the "Aiger 84 mm line") if necessary to fund the Plan Settlement, apparently conceding that it only needed one line to produce product for the overseas market. The accountant's projections for previous quarters (which have been consistently overestimated) still indicate that, even at those higher numbers, the Defendant only needed at most one line of each type. Inasmuch as it has agreed that it will not return

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

to the United States market until it has corrected all of its delinquencies in its escrow balances (new and old), the penalties thereon (new and old), and other amounts owing under the plan, it will take many years before that occurs through applying the interest from the escrow balances, even if they are increased considerably by changing the nature of the investments. During all that time, it will have no need for production from the three 100-mm lines or the 84-mm Aiger line.

I declare that the foregoing is true and correct under the penalty of perjury.

Executed this 14th day of May, 2010, at Washington, D.C.

*/s/ Karen Cordry*
Karen Cordry (DC Bar No. 278051)
Attorneys for the States

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

59815-005\DOCS_SF:72077.1